# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE APPRAISAL OF DFC GLOBAL CORP. | CONSOLIDATED C.A. No. 10107-CB |

## MEMORANDUM OPINION

Date Submitted: April 28, 2016
Date Decided: July 8, 2016

Geoffrey C. Jarvis and Kimberly A. Evans, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Attorneys for Petitioners*.

Raymond J. DiCamillo, Susan M. Hannigan and Rachel E. Horn, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Meryl L. Young and Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; *Attorneys for Respondent DFC Global Corporation.*

**BOUCHARD, C.**

In this appraisal action, former stockholders of DFC Global Corporation ("DFC") petitioned the Court to appraise the fair value of shares they held when the company was sold to a private equity buyer, Lone Star Fund VIII (U.S.), L.P. ("Lone Star") for $9.50 per share in June 2014. Petitioners allege that DFC was sold at a discount to its fair value during a period of regulatory uncertainty that temporarily depressed the market value of the company. Using a discounted cash flow model based on management's most recent five-year projections, petitioners' expert calculated a fair value of $17.90 per share. Respondent's expert used a discounted cash flow model and a multiples-based comparable companies analysis, blending the two to calculate a much lower fair value of $7.94 per share. Respondent also urges the Court to consider the transaction price of $9.50 per share as the most reliable evidence of fair value.

Although this Court frequently defers to a transaction price that was the product of an arm's-length process and a robust bidding environment, that price is reliable only when the market conditions leading to the transaction are conducive to achieving a fair price. Similarly, a discounted cash flow model is only as reliable as the financial projections used in it and its other underlying assumptions. The transaction here was negotiated and consummated during a period of significant company turmoil and regulatory uncertainty, calling into question the reliability of the transaction price as well as management's financial projections.

Thus, neither of these proposed metrics to value DFC stands out as being inherently more reliable than the other.

In this opinion I conclude that the most reliable determinant of fair value of DFC's shares is a blend of three imperfect techniques: a discounted cash flow model incorporating certain methodologies and assumptions each expert made and some of my own, the comparable company analysis respondent's expert performed, and the transaction price. Giving each equal weight, I conclude that the fair value of DFC's shares when the transaction closed was $10.21 per share.

## I. BACKGROUND

The facts recited in this opinion are my findings based on the stipulations of the parties, documentary evidence, and testimony presented at trial. I accord the evidence the weight and credibility I find it deserves.

### A. The Parties

Respondent DFC is a Delaware corporation with headquarters in Pennsylvania. DFC's business focuses on alternative consumer financial services, colloquially known as payday lending. DFC was publicly traded on the NASDAQ exchange from 2005 until it was acquired by an indirect subsidiary of Lone Star in a merger transaction (the "Transaction").[1]

---

[1] Stipulated Joint Pre-Trial Order ("PTO") ¶¶ 1, 41-44.

Petitioners Muirfield Value Partners, LP, Candlewood Special Situations Master Fund, Ltd., CWD OC 522 Master Fund, Ltd., Oasis Investments II Master Fund Ltd., and Randolph Watkins Slifka were stockholders of DFC at the time of the Transaction. Petitioners collectively hold 4,604,683 shares of DFC common stock that are eligible for appraisal.[2]

## B. DFC Faces Regulatory and Business Uncertainty

As of mid-2013, DFC was operating its payday lending business in ten countries through more than 1,500 retail storefront locations and internet platforms.[3] DFC faced significant competition in each of the countries in which it operated, although the nature of the competition varied from market to market.[4] DFC also was subject to regulations from different regulatory authorities across its markets.[5] One of the key risks DFC faced was the potential for changes to those regulations that could increase the cost of doing business or otherwise limit the company's opportunities.[6]

---

[2] PTO ¶¶ 12, 19, 24, 25, 30, 35.

[3] JX 295 at 4.

[4] *Id.* at 17.

[5] *See id.* at 18-22.

[6] *Id.* at 24-26.

In the United States, for instance, the Consumer Financial Protection Bureau began to supervise and regulate DFC. The company was unable to predict whether and to what extent the Consumer Financial Protection Bureau would impose new rules and regulations on it, which had the potential to adversely affect DFC's business in the United States.[7]

In the United Kingdom, DFC faced an even greater amount of regulatory uncertainty as a new regulator, the Financial Conduct Authority (the "FCA"), prepared to take over regulation of the payday lending industry, effective April 1, 2014.[8] Before then, the Office of Fair Trading (the "OFT") was DFC's regulator in the U.K.

In February 2012, the OFT began an in-depth review of some of the largest firms in the payday lending business to assess compliance with the Consumer Credit Act and the OFT's "irresponsible lending guidance."[9] In November 2012, the OFT issued debt collection guidance requiring payday lenders to make disclosures to consumers regarding the use of continuous payment authority and to avoid using continuous payment authority to collect money from customers who

---

[7] *Id.* at 26.

[8] JX 490 at 30.

[9] PTO ¶ 64.

were believed to be experiencing financial hardship.[10] Continuous payment authority is a mechanism by which lenders seek to automatically collect on loans by continuously accessing customers' checking accounts in order to withdraw funds shortly after they appear in the account.[11]

In March and April 2013, the OFT sent letters to each of DFC's U.K. businesses identifying deficiencies in their businesses and requiring corrective action.[12] This regulatory environment imposed certain transitional difficulties on DFC. In an earnings release on April 1, 2013, the company cut earnings guidance for the fiscal year (ending June 30) from $2.35-$2.45 per share to $1.70-$1.80 per share, noting that the transition period was causing liquidity problems for consumers in the United Kingdom, resulting in heightened loan default rates.[13]

In August 2013, DFC provided fiscal year 2014 adjusted EBITDA guidance of $200-240 million, noting that it was providing adjusted EBITDA rather than earnings per share until DFC had "clearer visibility as to the amount and timing of these [regulatory] issues."[14] DFC announced that it expected to operate "at a

---

[10] *Id.* ¶ 72.

[11] *See* Trial Tr. ("Tr.") 15-16 (Gavin), 412-13 (Kaminski); JX 565 at 4.

[12] PTO ¶ 77.

[13] *Id.* ¶ 79.

[14] JX 290 at 8.

5

continuing competitive disadvantage in the United Kingdom until all industry providers are required to operate consistently under the new regulatory framework."[15] The company also stated, on the other hand, that it was hopeful that its market share would increase as some lenders began to face difficulties operating within the stricter regulatory environment and exited the market.[16]

In October 2013, the FCA issued a paper containing proposed new regulations that DFC expected would be implemented on April 1, 2014, when the FCA assumed its regulatory authority.[17] Among these proposals were stricter affordability assessments that would be effective April 1, 2014, and limits to two rollovers per loan and two continuous payment authority attempts, effective July 1, 2014.[18] Rollovers allow a borrower to defer repayment of a loan by paying additional interest and fees.[19] Before the FCA issued its proposals, DFC had no limit on the number of rollovers its retail business would allow.[20] On November

---

[15] PTO ¶ 85.

[16] *Id.*

[17] *Id.* ¶ 89.

[18] *Id.*

[19] JX 587 at 76; JX 590 at 38.

[20] JX 587 at 76-77. DFC's online business was limited to six rollovers before principal would need to begin being repaid. *Id.* at 77.

25, 2013, DFC also received notice that by the beginning of 2015, the U.K. would implement a total cost of credit cap for the company's products.

On January 30, 2014, DFC cut its adjusted EBITDA projections again, lowering its fiscal year 2014 forecast from $200-240 million to $170-200 million, noting the continued difficulties with the U.K. regulatory transition.[21]

In February 2014, the OFT sent DFC a letter expressing serious concerns regarding DFC's ability to meet the FCA's impending new regulations.[22] In response, DFC implemented a two-rollover limit effective in late March 2014, and clarified the enhancements to the company's affordability assessments in April 2014.[23]

The company believed that it had a good track record for navigating regulatory change, giving it a potential advantage over its competitors, and that it may be able to grow where others could not.[24] DFC had previously navigated a period of significant regulatory change in Canada from about 2007 to 2010, during which the Canadian provinces assumed regulatory authority from the federal

---

[21] PTO ¶ 120.

[22] *Id.* ¶ 130.

[23] *Id.* ¶ 131.

[24] *Id.* ¶¶ 207, 208, 211.

government.[25] That regulation ended up benefiting DFC as more aggressive competitors were forced to scale back their operations, giving DFC a stronger market position after the regulatory environment stabilized.[26]

Encouraged by its previous success in the Canadian regulatory overhaul, DFC hoped to have a similar experience with the changing U.K. environment. Both before and after the Transaction closed, DFC management thought that some competitors might exit the market in light of the new regulatory regime, allowing DFC to capture additional market share.[27] At the same time, DFC was aware that modifying its U.K. lending practices to accommodate the impending regulations put it at a disadvantage compared to competitors who did not adopt the new regulations before they took effect.[28] In contrast, some of the key Canadian regulations had little impact on DFC's business because they were rate-focused, and DFC's products already fell within the acceptable rate range.[29] It is against this backdrop of regulatory uncertainty that the Transaction was negotiated.

[25] Tr. 135-37 (Gavin); JX 409 at 21, 25.

[26] *See id.*; Tr. 135-37 (Gavin); JX 587 at 66-67.

[27] JX 309 at 23; Tr. 410-11, 470-74 (Kaminski). The competitor exits they hoped for did not materialize. Tr. 436-37, 447 (Kaminski).

[28] PTO ¶ 75.

[29] JX 587 at 65-66; Tr. 400-01 (Kaminski), 514-15 (Barner), 139-40 (Kaminski) (contrasting regulatory price points in Canada, which allowed DFC to operate profitably, with price points in U.K., which did not). The U.K. also was the largest of DFC's

## C.    Lone Star Acquires DFC

In April 2012, DFC engaged Houlihan Lokey Capital Inc. ("Houlihan") to investigate selling the company to a financial sponsor. This decision was inspired in part by the regulatory uncertainty the company faced, in addition to the company's high leverage and questions regarding management succession.[30] Houlihan contacted six sponsors and eventually engaged in discussions with J.C. Flowers & Co. LLC and another sponsor, as well as an interested third party that Houlihan had not contacted.[31] During the summer, the three potential buyers conducted due diligence. In August 2012, one of the three lost interest in pursuing a transaction. In October, J.C. Flowers and the other potential buyer also lost interest.[32] Houlihan spent the next year reaching out to 35 more financial sponsors and three potential strategic buyers.[33]

In September 2013, DFC renewed discussions with J.C. Flowers and began discussions with Crestview Partners about a possible joint transaction.[34] In

---

markets, meaning the uncertain regulatory outcome would have a greater impact on the business than was the case with Canada. Tr. 140 (Kaminski).

[30] Tr. 24 (Gavin).

[31] PTO ¶¶ 65-68.

[32] *Id.* ¶¶ 67-70.

[33] *Id.* ¶ 71.

[34] *Id.* ¶¶ 87-88.

October 2013, Lone Star also expressed potential interest in DFC.[35] Part of Lone Star's interest in the transaction related to the regulatory uncertainty. Lone Star sought to take advantage of this uncertainty by buying DFC at this time, when its performance was weak and outlook unclear.[36]

In November 2013, DFC gave the three potential acquirers financial projections prepared by DFC's management.[37] On December 12, 2013, DFC got some bad news and some good news: Crestview was no longer interested in pursuing a transaction, but Lone Star made a preliminary non-binding indication of interest in acquiring DFC for $12.16 per share.[38] On December 17, J.C. Flowers made its own non-binding indication at $13.50 per share.[39]

On February 14, 2014, DFC's board approved a set of revised projections prepared by management, which they shared with J.C. Flowers and Lone Star.[40] These projections lowered DFC's projected earnings compared to the projections approved in November.[41] On February 28, 2014, Lone Star offered to buy DFC for

---

[35] *Id.* ¶ 91.

[36] Tr. 533-37 (Barner).

[37] PTO ¶ 108.

[38] *Id.* ¶¶ 113-14.

[39] *Id.* ¶ 117.

[40] *Id.* ¶¶ 123-25.

[41] *Id.* ¶¶ 108, 123.

$11.00 per share and requested a 45-day exclusivity period.[42] To justify the reduction in price from its original indication of interest, Lone Star explained that the drop was due to the U.K. regulatory changes, the threat of increased U.S. regulatory scrutiny, downward revisions to company projections, reduced availability of acquisition financing, stock price volatility, and weak value in the Canadian dollar.[43] On March 11, DFC entered into the requested exclusivity agreement with Lone Star.[44]

On March 26, 2014, DFC provided Lone Star with DFC management's revised preliminary adjusted EBITDA forecast for fiscal year 2014, which had dropped by $24 million compared to the February projections.[45] The next day, Lone Star offered to buy DFC for $9.50 per share in cash, explaining this new drop in price as taking into account, among other things, the further downward revisions in company projections, another reduction in available acquisition financing, continued regulatory changes in the U.K., and a class action suit against the company that was disclosed in an 8-K filed on March 26, 2014.[46] Lone Star gave

---

[42] *Id.* ¶ 132.

[43] *Id.* ¶ 133.

[44] *Id.* ¶ 140.

[45] *Id.* ¶ 146.

[46] *Id.* ¶¶ 147-48.

DFC 24 hours to accept the offer, but later extended that deadline to April 1, 2014.[47]  After receiving Lone Star's offer, Houlihan did not contact any other financial sponsors or strategic buyers about a potential transaction.[48]

At the end of March, DFC approved another set of projections (the "March Projections") and directed management to share them with Lone Star.[49]  Projected earnings dropped compared to the February projections, although the decline was less substantial than the decline from the November projections to the February projections.[50]  On April 1, DFC's board approved the Transaction and entered into a merger agreement with Lone Star.[51]  The next day, DFC announced the Transaction and publicly cut its earnings outlook once again, reducing its 2014 fiscal year EBITDA projections from $170-200 million to $151-156 million.[52]  The Transaction closed on June 13, 2014.[53]

---

[47] *Id.* ¶ 149.

[48] *Id.* ¶ 152.

[49] *Id.* ¶¶ 156, 160.

[50] *Id.* ¶¶ 108, 123, 161.

[51] *Id.* ¶¶ 172-73.

[52] *Id.* ¶ 175.

[53] *Id.* ¶ 5.

## D. Procedural Posture

Between June 18 and October 1, 2014, petitioners filed petitions for appraisal under 8 *Del. C.* § 262.[54] This Court consolidated their petitions on October 9, 2014,[55] and held a three-day trial in October 2015. Post-trial argument was held on April 1, 2016, after which the parties provided further submissions.

## II. LEGAL ANALYSIS

### A. Legal Standard

Petitioners request appraisal of their shares of DFC under 8 *Del. C.* § 262. "An action seeking appraisal is intended to provide shareholders who dissent from a merger, on the basis of the inadequacy of the offering price, with a judicial determination of the fair value of their shares."[56] Respondent has not disputed petitioners' eligibility for an appraisal of their shares.[57]

In an appraisal action, the Court will determine the fair value of the dissenting stockholders' shares "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In

---

[54] *See* Stipulation and Order for Consolidation and Appointment of Grant & Eisenhofer P.A. as Lead Counsel at 2.

[55] *Id.* at 5.

[56] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989).

[57] PTO ¶ 12.

determining such fair value, the Court shall take into account all relevant factors."[58]    The appraisal excludes any value resulting from the merger itself because its purpose is to compensate dissenting stockholders for what was taken from them.[59]    Consequently, the value of the stock must be appraised on a going concern basis.[60]

In using "all relevant factors" to determine fair value, the Court has significant discretion to use the valuation methods it deems appropriate, including the parties' proposed valuation frameworks, or one of the Court's own making.[61] This Court has relied on a number of different approaches, including comparable company and transaction analyses, discounted cash flow analyses, and the price of the relevant transaction if it was struck at arm's length.[62]    "This Court may not

---

[58] 8 *Del. C.* § 262(h).

[59] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983) (quoting *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950)).

[60] *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *8 (Del. Ch. Nov. 1, 2013), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE).

[61] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *15 (Del. Ch. Jan. 30, 2015).

[62] *See Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 1877536, at *6 (Del. Ch. May 12, 2014) (compiling authorities).  *See also In re Lane v. Cancer Treatment Ctrs. of Am., Inc.*, 1994 WL 263558, at *2 (Del. Ch. May 25, 1994) ("[R]elevant factors to be considered include assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.") (quoting *Weinberger*, 457 A.2d at 711) (internal quotation marks omitted).

14

adopt at the outset an 'either-or' approach, thereby accepting uncritically the valuation of one party, as it is the Court's duty to determine the core issue of fair value on the appraisal date."[63]  "In an appraisal proceeding, the burden to establish fair value by a preponderance of the evidence rests on both the petitioner and the respondent."[64]

## B.    Overview of Valuation Methodologies

Petitioners and respondent submitted the reports of experts who performed valuations of DFC.   Kevin F. Dages, Executive Vice President of Compass Lexecon, was petitioners' expert.  Daniel Beaulne, Managing Director of Duff & Phelps, LLC, was respondent's expert.

Dages relied solely on a discounted cash flow model for his valuation.  He also performed a multiples-based comparable company analysis but gave it no weight in his valuation.[65]   Based on the discounted cash flow model alone, he valued DFC at $17.90 per share.[66]

Beaulne used a discounted cash flow model, valuing the company at $7.81 per share, and a multiples-based comparable company analysis, valuing the

---

[63] *In re Appraisal of Metromedia Int'l Gp., Inc.*, 971 A.2d 893, 899-900 (Del. Ch. 2009).

[64] *Laidler*, 2014 WL 1877536, at *6 (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999)).

[65] JX 596 ("Dages Report") ¶¶ 99-105.

[66] *Id.* ¶¶ 92, 117.

company at $8.07 per share.[67] He weighted each methodology equally (50-50) for a final fair value of $7.94 per share.[68] Respondent further argues that the transaction price of $9.50 is a reliable indicator of fair value,[69] a proposition petitioners vigorously dispute.[70]

There is a wide gap of $10.09 per share between the experts' discounted cash flow valuations, a difference larger than the deal price itself. This sharp divide is the result of many disagreements regarding the proper inputs and methods to use in the discounted cash flow model.[71] I begin by analyzing the parties' respective positions regarding the discounted cash flow model in order to determine the inputs for the model I use. I then turn to consider respondent's multiples-based comparable company analysis and the transaction price.

---

[67] JX 597 ("Beaulne Report") at 64, 69.

[68] *Id.* at 71.

[69] Resp't's Post-Trial Br. 4-14.

[70] Pet'rs' Post-Trial Reply Br. 4-15.

[71] Unfortunately, the existence of drastic differences between experts' valuations is not an uncommon issue. *See In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *45 (Del. Ch. May 31, 2016) (expressing concern over the problem of significant valuation differences between experts and citing study showing that respondents' experts produced valuations on average 22% below deal price, and petitioners' experts produced valuations on average 186% above deal price) ("Two highly distinguished scholars of valuation science, applying similar valuation principles, thus generated opinions that differed by 126%, or approximately $28 billion. This is a recurring problem.").

## C.     The Discounted Cash Flow Model

The experts have numerous points of disagreement regarding how to construct a discounted cash flow valuation of DFC, but a few areas are largely undisputed. I begin with those. Dages and Beaulne had somewhat different approaches to the firm's capital structure to be used in the discounted cash flow model, with Beaulne using DFC's current debt-to-capital ratio of 74% and Dages using three different capital structure scenarios. Both experts note that management did not have a target capital structure, and Dages agrees that Beaulne's use of a 74% ratio is reasonable.[72] Like Beaulne, rather than test multiple scenarios, I will use a 74% debt-to-capital ratio.

Dages and Beaulne estimated the cost of debt using the yield to maturity of DFC's 2016 senior notes,[73] but Beaulne used a measurement date closer to (but still before) the announcement of the Transaction. Beaulne criticizes Dages' use of a less recent measurement period,[74] and Dages appears to agree that Beaulne's more recent figure is a reasonable choice.[75] I will therefore use Beaulne's estimate of 10.0% rather than Dages' estimate of 9.1%.

---

[72] JX 601 ("Dages Rebuttal") ¶ 14.

[73] Dages Report ¶ 72, Beaulne Report at 53-54.

[74] JX 600 ("Beaulne Rebuttal") at 11.

[75] Dages Rebuttal ¶ 15 (describing cost of debt as one of the inputs on which the experts could agree).

17

Dages and Beaulne agreed on the risk-free rate (3.14%) and the equity risk premium (6.18%).[76] These metrics are reasonable, and I adopt them as well.

Turning to the disputed inputs, which are numerous, the primary areas of disagreement concern various factors used to calculate DFC's weighted average cost of capital ("WACC"), namely beta, the method of unlevering and relevering beta, the appropriate size premium, and the tax rate. The experts also disagree over certain adjustments to the company's projected cash flows, including changes to net working capital and adjustments to account for stock-based compensation expenses. Finally, the experts disagree over whether to use a two-stage model or a three-stage model for calculating DFC's value. I address these issues below.

### 1. Beta

"Market or systematic risk is measured . . . by *beta*. Beta is a function of the *expected* relationship between the return on an individual security . . . and the return on the market."[77] Beta is used together with the equity risk premium to estimate the expected risk premium for the subject company as a component of its cost of capital.[78] A relatively small change in beta can substantially affect the WACC and, consequently, the outcome of a discounted cash flow model.

---

[76] Dages Report ¶¶ 75, 79; Beaulne Report Ex. II.

[77] Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 203 (5th ed. 2014) [hereinafter *Cost of Capital*].

[78] *Cost of Capital* at 202-03.

Although determining beta is an important exercise, it can be a quite theoretical one. The experts' theories diverge significantly on this metric, leading to markedly different valuations.

Dages estimated DFC's beta using two years of weekly stock returns for DFC and nine peer companies relative to a market index.[79] Bloomberg L.P. is Dages' source for these estimates.[80] Dages used raw beta, as opposed to smoothed beta.[81] Using these companies, Dages estimated three betas that he uses in calculating his WACC: one based on DFC's observed beta, one based on all nine peer companies, and one based on the six of his nine peer companies that are based in the United States.[82]

Beaulne estimated beta using two different methodologies and took the midpoint of the two.[83] Beaulne used the betas of six peer companies, all of which were included in Dages' peer group.[84] Unlike Dages, he did not use the historical

---

[79] Dages Report ¶ 76, Ex. 3 (listing nine peer companies that are shaded, indicating inclusion in beta estimate).

[80] *Id.* ¶ 76.

[81] Dages Report ¶ 77, Ex. 10. I explain the difference in my analysis below.

[82] *Id.* ¶¶ 76-77, Ex. 10. Dages did not average these beta groups, but instead used them to construct a beta range and select betas within that range for his various capital structure scenarios. *See* Dages Report Ex. 11.

[83] Beaulne Report at 56.

[84] *Id.* at 55-56, 66.

beta of DFC itself in addition to his selected peers.[85] His first method used Bloomberg weekly beta for a five-year period, in contrast to Dages' two-year period. Beaulne used smoothed beta, rather than raw beta.[86] Smoothed beta adjusts the historical (raw) beta by taking an average of the historical beta, weighted two-thirds, and the market beta of 1.0, weighted one-third.[87] Consequently, this smoothed beta will be higher than raw beta for relatively stable companies with a raw beta below 1.0, but will be lower than raw beta for more volatile companies with a raw beta above 1.0. The purpose of this adjustment is to create a forward-looking estimated beta from the historical beta, based on the assumptions that a company's beta will revert to the market average and that an estimate of 1.0 is superior to an unreliable beta estimate.[88]

Beaulne's second methodology was to use the betas provided by Barra[89] as of May 31, 2014. Barra calculates predicted, forward-looking betas using a proprietary model designed to measure a firm's sensitivity to changes in the

---

[85] Tr. 706 (Beaulne).

[86] Beaulne Report at 56-57.

[87] *Id.*

[88] *See Cost of Capital* at 211.

[89] Barra is a company owned by MSCI Inc. that provides global investment decision-making tools, including market indices and a beta service. Beaulne Report at 56; Tr. 596 (Beaulne).

20

industry or the market.[90] The model still relies on historical baseline information, but makes adjustments based on various factors in order to determine the forward-looking beta figure.[91] Beaulne used Barra betas that were benchmarked against a global index.[92]

To summarize, the main points of contention between the experts regarding beta are: (1) whether to include Barra beta or only use Bloomberg beta; (2) which companies to include in the beta estimate; (3) whether to use a two-year or a five-year historical period; and (4) whether to use raw beta or smoothed beta. I address these in turn.

### a. Barra Beta

Dages criticizes Beaulne's use of Barra beta for half of his beta estimation, while Beaulne criticizes Dages for omitting Barra beta. Beaulne's criticism is primarily that different methods of calculating beta can produce very different results, and thus by implication, using multiple beta methodologies will improve the robustness of the estimate.[93]

---

[90] Beaulne Report at 56; *Cost of Capital* at 217.

[91] Tr. 595-97 (Beaulne).

[92] Beaulne Report at 56.

[93] *See* Beaulne Rebuttal at 7.

Dages criticizes the use of Barra betas because they derive from a proprietary model and cannot be replicated.[94] Dages opines that, without the ability to replicate or reverse engineer Barra betas, one cannot properly determine whether they should be included in the beta estimate or whether they deserve to be given the same weight as the Bloomberg betas.[95] Beaulne contends that Barra is not quite such a black box. For one thing, he notes that he could have paid Barra a substantial price to see each factor in the Barra model if he had wished to receive this information.[96] Presumably, this would have allowed him to see the value and weighting of each factor and truly understand each beta figure. In addition, at Beaulne's request, Barra gave Beaulne the replications of their formulas for the peer group betas Beaulne relied upon in this case.[97] Beaulne also opined that his firm has performed quality checks using the beta replications in the past,[98] but admitted that it has not performed any analysis on the predictive value of Barra betas in general.[99]

---

[94] Dages Rebuttal ¶ 18.

[95] Tr. 254, 319-20 (Dages).

[96] Tr. 598 (Beaulne).

[97] Tr. 599-600 (Beaulne).

[98] Tr. 599 (Beaulne).

[99] Tr. 704 (Beaulne), 770-71 (Dages). *See also* Tr. 601-02 (Beaulne) (admitting that there is no authoritative literature analyzing predictive power of Barra beta).

In this case, Dages' concerns regarding the proprietary nature of Barra betas are persuasive. In *Golden Telecom*, this Court expressed similar concerns when it rejected the use of Barra beta because Barra did not publicly disclose the weight of each factor used in its proprietary model, did not explain the changes in different versions of the model, and because the expert who relied upon it did not fully understand all details of the model.[100] The Court emphasized that it was not rejecting the use of Barra beta in all cases, but noted that a record of how Barra beta works and why it is superior would be a necessary prerequisite to its adoption in other appraisal cases.[101] This Court has subsequently approved the use of Barra beta in another case,[102] but heeding the warnings laid out by *Golden Telecom* is more appropriate in the present context.

Here, as in *Golden Telecom*, I am not convinced that Beaulne fully understood the details underlying the peer companies' Barra betas or why they differed from those companies' Bloomberg betas. It did not appear that he could recreate the Barra betas he used.[103] Although Barra replicated its betas for him in

---

[100] *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 520 (Del. Ch. 2010) (Strine, V.C.), *aff'd*, 11 A.3d 214 (Del. 2010).

[101] *Id.* at 521.

[102] *IQ Hldgs., Inc. v. Am. Commercial Lines Inc.*, 2013 WL 4056207, at *4 (Del. Ch. Mar. 18, 2013) (using Barra beta while noting that it fell at the midpoint of expert's other beta estimates), *aff'd*, 80 A.3d 959 (Del. 2013) (TABLE).

[103] Tr. 695-96 (Beaulne).

this case, when questioned about the betas for one of his comparable companies, Beaulne was unable to explain why the company's Barra beta was significantly higher than its Bloomberg beta.[104] Perhaps most problematic, neither Beaulne nor any published research has demonstrated the predictive effectiveness of Barra betas.[105] Consequently, I have very little information guiding whether to rely on Barra betas in constructing a valuation of DFC. There is no benefit to using a second beta methodology without confidence in the methodology itself. Unlike Beaulne, I am not confident that Barra betas are sufficiently reliable to warrant a 50% weighting, a value that Beaulne seems to have chosen arbitrarily, or to warrant any weighting in this case. Thus, although they may have use in other cases, I reject the use of Barra betas here, and will use only Bloomberg betas.

### b. Beta Peer Group

The experts used different peer groups of companies to compute their respective estimates of beta. Beaulne used six companies in his analysis. Dages used nine companies, including the same six that Beaulne used.[106]

---

[104] Tr. 701-03 (Beaulne).

[105] *See supra* note 99.

[106] The six peer companies in common are: Cash America International, Inc., Cash Converters International Limited, EZCORP, Inc., First Cash Financial Services Inc., International Personal Finance Plc, and World Acceptance Corp. Dages Report Ex. 10; Beaulne Report Ex. II.

24

Each of the six companies both experts used was comparable to DFC, as evidenced by the experts' agreement on them and by their use in peer group analyses that six different firms (including DFC itself, Lone Star, and Houlihan) used to evaluate DFC for various reasons from April 2013 to June 2014.[107] Four of these peer companies were used by all six firms in their analyses.[108]

Dages selected three additional peers: Provident Financial plc, Springleaf Holdings, Inc., and Credit Acceptance Corporation.[109] These three peers were only selected as comparable companies in one or two of the analyses described above. Respondent criticizes these peers as incomparable to DFC. Dages conceded some of these differences at trial. One of Provident Financial's primary products is credit cards, but DFC does not have a credit card business.[110] Springleaf offers life insurance products, unlike DFC.[111] Credit Acceptance specializes in automobile financing programs to car dealers.[112] The only firm to select Credit Acceptance as a comparable company (KPMG) used it only to compare it to one minor line of

---

[107] Dages Report Ex. 3. The other three firms were KPMG, ICR, and Hudson Americas.

[108] *Id.*

[109] *Id.* Ex. 10.

[110] *Id.* Ex. 4; Tr. 371 (Dages).

[111] Dages Report Ex. 4; Tr. 371 (Dages). *See also* Tr. 641 (Beaulne) (opining that Springleaf was in several businesses that were fundamentally different from DFC's).

[112] Dages Report Ex. 4.

DFC's business representing a small percentage of revenue for purposes of an impairment analysis.[113] These companies differ meaningfully from DFC and are not appropriate comparisons in my view. Beaulne's selection of six peers, all of which Dages also selected, is the more appropriate group, which I will use.

Apart from the disagreement over the three additional companies Dages used in his peer group, Dages criticizes Beaulne for failing to incorporate or even consider DFC's own beta in his analysis. The experts agree that using a peer group tends to be preferable to using only DFC's beta, because using a single company's beta exposes the estimate to measurement error and idiosyncrasies.[114] But Dages assessed DFC's beta alongside the peer group's betas in order to select the appropriate beta,[115] while Beaulne disregarded it.[116]

I agree that using DFC's beta in isolation would expose the discounted cash flow model to measurement error. At the same time, the most comparable company to DFC is DFC itself, and in my view it is appropriate to factor DFC's beta into the analysis, a proposition that Dages supports and Beaulne did not rebut.

---

[113] Tr. 370 (Dages), 641 (Beaulne).

[114] Tr. 318-19 (Dages), 593 (Beaulne), 708-09 (Beaulne). At trial, Dages also commented that he was sufficiently comfortable with DFC's standalone beta that he would be willing to use it in isolation. Tr. 764-67 (Dages).

[115] Tr. 764-67 (Dages).

[116] Tr. 706-07 (Beaulne).

The simplest way to do so is by adding it as a seventh beta in the peer analysis. Although commentary on this approach is somewhat sparse, constructing a beta that blends the company's beta with a peer group's betas finds some support in financial literature[117] and this Court's precedent.[118]

In the *Golden Telecom* case, this Court supported the theory in two ways. First, the Court used as a peer group an index of NASDAQ-traded telecommunications companies, which the Court noted included the subject company itself. Second, and more importantly, the Court's final beta was a blend of the Company's observed beta, weighted 2/3, and the industry peer group's beta, weighted 1/3.[119] By adding DFC as a seventh "peer" in the beta calculation, I am essentially performing the same exercise, albeit with a smaller peer group and a more modest weight applied to the subject company than in *Golden Telecom*, to arrive at a final beta weighted 14% (1/7) to DFC's beta and 86% (6/7) to the peer group's betas. Because DFC's own observed beta is a meaningful input alongside

---

[117] *See* Robert W. Holthausen & Mark E. Zmijewski, *Corporate Valuation: Theory, Evidence & Practice* 308 (1st ed. 2014) (discussing the Vasicek Adjusted Beta Method, which provides a blend between the subject company's beta and a peer group or industry beta, weighted by standard error); *id.* at 309, 334 (providing and explaining beta calculation exercises that involve averaging betas of peer companies and the subject company).

[118] *See Golden Telecom*, 993 A.2d at 523.

[119] *Id.* at 523-24.

the betas of its peers, I consider this weighting preferable to the 0% weighting DFC would receive in the peer-only analysis.[120] I therefore use DFC and its six peers to estimate DFC's beta.

### c. Measurement Period

In selecting their betas, Beaulne used a five-year measurement period and Dages used a two-year period. A five-year period is the most common for measuring beta and generally results in a more accurate measurement, although two-year periods are used in certain circumstances.[121]

At trial, Dages opined that he used the two-year measurement period to capture the regulatory uncertainty in the market.[122] Beaulne contended that shorter periods are used when a fundamental change in business operations occurs, not when an industry is continuously going through regulatory change.[123] Beaulne's account better matches that of authoritative literature, which lists reasons for a shorter period such as a major acquisition or divestiture, financial distress, or

---

[120] Adding DFC to the beta analysis reduces DFC's estimated beta, because DFC's *unlevered* beta is on the low end of its peer group, although its levered beta is high as a result of the agreed capital structure, consisting of 74% debt. *See* Appendix B.

[121] *Cost of Capital* at 208; James R. Hitchner, *Financial Valuation: Applications and Models* 256 (3d ed. 2011). A related decision is how frequently to sample beta, with a monthly basis being the most common. *Cost of Capital* at 208. Here, both experts used weekly sampling, as do I.

[122] Tr. 255 (Dages).

[123] Tr. 594-95 (Beaulne).

cancellation of a significant contract.[124]  In my opinion, a five-year measurement period is conducive to a more accurate beta estimate in this case.

### d. Beta Smoothing

Dages used raw betas while Beaulne used smoothed betas.  The beta smoothing technique Beaulne used adjusts historical raw beta to a forward-looking beta estimate by averaging the historical estimate, weighted two-thirds, with the market beta of 1.0, weighted by one-third.[125]  This practice attempts to capture the tendency of betas to revert over time to the market mean of 1.0, a tendency Dages acknowledged at trial.[126]  This practice also recognizes that, when beta estimates are unreliable, an estimate of 1.0 can be a superior estimate.[127]  In light of my decision not to use Barra betas, which are also forward-looking, I believe it is appropriate to adjust historical betas to a forward-looking estimate for purposes of constructing a forward-looking WACC, even if the smoothing methodology appears somewhat crude.

---

[124] *Cost of Capital* at 208.  *See also* Tim Koller, Marc Goedhart & David Wessels, *Valuation: Measuring and Managing the Value of Companies* 247 (5th ed. 2010) (noting that long estimation period may be inappropriate when analysis of the five-year historical chart shows changes in corporate strategy or capital structure that could render prior data irrelevant).

[125] *Cost of Capital* at 211; Tr. 595 (Beaulne) (describing use of smoothed beta to generate a forward-looking estimate).

[126] *Cost of Capital* at 211; Tr. 332 (Dages).

[127] *Cost of Capital* at 211.

29

* * * * *

To summarize, the beta calculation I will use consists of Bloomberg five-year smoothed betas for the six peer companies the two experts agreed on and for DFC itself. I will use the average of this peer group and will not use Barra betas.[128]

### 2. Beta Unlevering Method

Published betas "for publicly traded stocks typically reflect the leverage of each respective company," which means that these betas incorporate both business risk and capital structure risk.[129] All else being equal, the equity of companies with higher levels of debt is generally riskier than that of companies with lower levels of debt.[130] In order to properly apply the betas of peer companies to a subject company, those companies' betas must be adjusted to account for the differences between the capital structures of the peer companies and of the subject company.[131] This is accomplished in a few steps: first, unlevering the betas of the peer group companies to their theoretical values as if the companies had no debt,

---

[128] To put this conclusion in perspective, I note that both experts acknowledged that the difference between the two-year and the five-year period and between using smoothed and raw Bloomberg betas was of minor importance in this case. Tr. 710-12 (Beaulne); Dages Rebuttal ¶ 19.

[129] *Cost of Capital* at 243.

[130] *Id.* at 243.

[131] *Id.* at 244; Tr. 185-87 (Dages).

thereby removing capital structure risk and leaving only business risk; second, estimating the subject company's unlevered beta in light of the peer group's unlevered betas (for instance, by taking the average); and third, relevering that beta to reflect the amount of debt present in the subject company's capital structure and the resulting capital structure risk.[132]

Beaulne and Dages used different formulas for unlevering the betas of DFC's peer group. Dages unlevered beta using the Fernández formula, which accounts for the beta of the company's debt,[133] while Beaulne used the Hamada formula, which does not.[134] Unsurprisingly, each expert contends that the other's chosen methodology is inferior.

The Hamada formula is generally accepted and commonly used for unlevering and relevering equity betas.[135] Dages concedes that the Hamada formula is frequently used, especially compared to the Fernández formula.[136] Nonetheless, a leading authority has cautioned that its use is generally inconsistent

---

[132] *Cost of Capital* at 244.

[133] Dages Report Ex. 10; Dages Rebuttal ¶ 22; *Cost of Capital* at 255-56.

[134] Beaulne Report Ex. II; Beaulne Rebuttal at 5-6; *Cost of Capital* at 247-48.

[135] Beaulne Rebuttal at 5. *See also Cost of Capital* at 247 (noting that Hamada formulas are commonly cited); Tr. 644 (Beaulne). The Hamada formulas are listed in Appendix B.

[136] Tr. 187, 256, 332, 783 (Dages).

with capital structure theory and practice, recommending that practitioners instead use one of several other formulas, including the Fernández formula.[137]

The Fernández formula, however, is not commonly used in estimating a public company's weighted average cost of capital.[138] At trial, Beaulne opined that he had never seen anyone use it to unlever and relever betas despite the fact that the concept has been around for a long time, and that the formula had not been peer-reviewed.[139] As mentioned above, however, at least one persuasive authority has suggested that the Fernández formula is more appropriate than the Hamada formula.

The Fernández formula attributes some of the risk inherent in beta to a company's debt, lowering the beta of its equity.[140] To properly use the Fernández formula, a practitioner must estimate the beta of the company's debt, based on fluctuations in the debt's market price.[141] Here, instead of using debt betas for each individual company, Dages used the same debt beta of 0.31 for all the peer companies, based on a regression of the two-year returns of a high-yield corporate

---

[137] *Cost of Capital* at 266.

[138] Beaulne Rebuttal at 5.

[139] Tr. 643-44 (Beaulne).

[140] Tr. 187-88 (Dages).

[141] *Cost of Capital* at 219-23.

bond ETF against the S&P 500 index.[142]  Beaulne criticizes Dages' failure to use individual debt betas estimated for each company.[143]  Alternately, when observed debt betas are unavailable, a practitioner can estimate an individual company's debt beta by creating a synthetic credit rating for that company.[144]  Dages did not do this either.[145]

The Fernández formula has merits that may warrant its use in an appropriate case.  But here, the limits in available data, namely the lack of observed or even estimated debt betas for each individual company in the peer group, negate the benefit that the formula could provide.  Beaulne opined that it is more appropriate to use the Hamada formula than to use the Fernández formula based on a debt index without measuring each company's debt betas, which could lead to skewed results.[146]  I agree.  No method is ideal.  But, in my view, it is more appropriate in this case to use the Hamada formula, which is widely accepted, readily understood, and not subject to dispute about whether it is properly calculated, even if it is arguably an imperfect tool.

---

[142] Dages Report ¶ 77 n.168; Tr. 333-34 (Dages).

[143] Beaulne Rebuttal at 6.

[144] Tr. 336-38 (Dages); *see also Cost of Capital* 220-21 (providing table of beta estimates based on credit ratings, which Dages also did not use).

[145] Tr. 338 (Dages).

[146] Tr. 646-47, 748 (Beaulne).

### 3. Size Premium

A size premium is an adjustment to a company's estimated cost of capital to reflect risks stemming from the size of the company, following the general theory that smaller companies tend to be riskier than larger ones.[147] Both experts applied size premiums in calculating DFC's weighted average cost of capital.[148] They disagree, however, on the magnitude of that premium.

Dages calculated his size premium based on DFC's equity market capitalization on April 1, 2014, the day before the announcement of the Transaction. He used this market capitalization to determine the decile in the Duff & Phelps 2014 Valuation Handbook into which DFC would fall.[149] DFC's market capitalization of $346 million as of April 1 placed it within the 9th decile ($340 million to $633 million). According to the Valuation Handbook, that decile corresponds to a size premium of 2.81%, which Dages used.[150]

Beaulne took a more complicated approach using two sources of size premiums: (1) the 2014 Duff & Phelps Valuation Handbook, which Dages used, and (2) the Duff & Phelps Risk Premium Report. He chose the midpoint of the

[147] *Cost of Capital* at 301, 308.

[148] Beaulne Report at 58-59; Dages Report ¶¶ 80-81.

[149] *Id.* ¶¶ 80-81.

[150] *Id.*; Duff & Phelps, *2014 Valuation Handbook: Guide to Cost of Capital* Appendix 3 [hereinafter *Valuation Handbook*].

two size premiums he selected from these sources (3.87% and 4.60%) to reach his final size premium of 4.24%.[151]

As explained below, I disagree with Beaulne's use of the Risk Premium Report and I come to a different conclusion than both of the experts on which size premium to use from the Valuation Handbook based on some of the considerations to which Beaulne testified. In my opinion, the appropriate size premium to use in calculating the WACC is 3.52%.

For the first part of his methodology, Beaulne selected a different size premium from the Valuation Handbook than Dages because Beaulne used a microcap value for the combined 9th and 10th deciles, which cover companies with a market capitalization in a wide range, from about $2.4 million to $632.8 million.[152] Beaulne opined that this approach was appropriate because DFC's market capitalization fell close to the edge of the 9th decile and would have fallen into the 10th if its market capitalization was just two percent lower.[153] In his opinion, falling into the lower decile was a realistic possibility because of discouraging financial results issued on April 2, 2014, the same day the transaction was announced. Although April 1 was the last unaffected trading day, Beaulne

---

[151] Beaulne Report at 58-59.

[152] *Id.* at 58; *Valuation Handbook* Appendix 3.

[153] Beaulne Rebuttal at 10.

viewed the negative financial developments disclosed on April 2 as part of the company's intrinsic value, justifying some blending of the two deciles.[154]

Beaulne also justified his selection of the combined 9th and 10th deciles on the theory that, because the valuation for which the size premium is being selected is supposed to be based on an independent discounted cash flow analysis, that form of valuation should determine the appropriate size decile, rather than a company's market capitalization, which is based on stock price. According to Beaulne, this leads to a "circularity issue because you can . . . predetermine which decile you fall into based on your selection."[155] Beaulne claimed to have avoided this issue by choosing a size premium based on a broader category incorporating both deciles.

Constructing a valuation based on an iterative methodology, and selecting a size premium based on that valuation, appears to be a practice suited for companies that are not publicly traded. Practitioners are advised to use an iterative process for closely held companies because, in the absence of a publicly known market capitalization, the analyst does not know the value of the company until she has completed the valuation.[156] In *Sunbelt*, this Court recognized the circularity

---

[154] *Id.* at 10-11; Tr. 648 (Beaulne).

[155] Tr. 613 (Beaulne).

[156] *See Cost of Capital* at 1204.

problem inherent in valuing companies with unknown market capitalizations.[157] The fact that market value is the key input in determining a private company's size premium is problematic, particularly when the company falls close to the border between two size premium measures, because the size premium then affects the valuation of the company.[158] Acknowledging the need to address this methodological problem, the Court in *Sunbelt* selected a size premium for the two valuation deciles that the company appeared to straddle, thus avoiding the need to choose one decile over the other.[159] Beaulne took the same approach by using the microcap category covering both the ninth and tenth deciles, with a resulting size premium of 3.87%.

Beaulne's methodology overlooks the key difference in this case: the market capitalization of DFC was not unknown, because DFC was a public company. In other words, it is not necessary to attempt to artificially derive an approximation of DFC's market value because the actual market value of DFC was known. Beaulne's argument against using market value to construct a fundamental value thus misses the point here. The size premium is indeed an input into the

---

[157] *In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *11 (Del. Ch. Jan. 5, 2010), *as revised* (Feb. 15, 2010) (discussing circularity problem in context of a private company).

[158] *Id.* at *11-12.

[159] *Id.* at *12.

Court's calculation of fundamental value—it affects the cost of capital used in the discounted cash flow model, thereby affecting the valuation. But the size premium itself is calculated using market value, when available, as it is here.[160] That the size premium is being used in a fundamental valuation does not affect how the size premium itself is calculated.

That said, I agree with Beaulne that the market value of DFC on April 1, 2014 was missing an important piece of information. On April 2, just one day later, DFC announced reduced earnings guidance at the same time that it announced the Transaction.[161] The reduction was significant, moving from the previous quarter's guidance of $170-200 million in 2014 adjusted EBITDA to $151-156 million.[162] Beaulne opines that it is inappropriate to use the market value as of April 1, 2014 because that value did not reflect the negative impact of the reduced earnings guidance.[163]

---

[160] *See Cost of Capital* at 308 (noting that size premium decile tables are constructed based on market capitalization); *id.* at 327 (noting that size measures are based on market value and that iterative process or alternate studies can be used when valuing a *nonpublic* business or division); *id.* at 302 (noting that market value of equity is the traditional measure of size, although not the only possible measure); *id.* at 1204-05.

[161] PTO ¶ 175.

[162] *Id.* ¶¶ 120, 175.

[163] Beaulne Rebuttal at 10-11.

April 1 must be used in selecting the size premium because it was the last unaffected trading date before the Transaction, and therefore properly excluded the effect of the Transaction. Nonetheless, I agree with Beaulne that the reduced financial projections were part of DFC's value as of that date but had not yet been realized in the market. As discussed above, my chosen methodology for calculating DFC's size premium does not use intrinsic value but rather uses market capitalization. Therefore, although I do not need to estimate DFC's intrinsic value for this calculation, the impending earnings announcement undoubtedly would have affected DFC's market capitalization, which is the relevant metric for selecting the size premium. It is impossible to know exactly how much the market would have reacted to the reduction in projected earnings, because the stock price that day also was affected by the announcement of the Transaction. But common sense suggests, and Dages concedes, that the market would have reacted negatively because the earnings reduction was meaningful.[164]

If DFC had been resting comfortably within one of the deciles, perhaps no adjustment would be warranted. But in this case, DFC rested on a knife's edge between the 9th and 10th deciles. A decline of less than $7 million (about 2%) in market capitalization would have caused the company to drop into the 10th

---

[164] Tr. 344-46 (Dages).

decile.[165]   It is very likely in my view that, all else equal, the announced drop in projected earnings would have caused such a decline in DFC's unaffected stock price.  As such, the most reasonable inference is that DFC's market capitalization would have fallen into the 10th decile despite having been in the 9th the previous day.

The 10th decile is broken into subdeciles because the complete decile reaches from market capitalizations as large as $338.8 million to as small as $2.4 million.  The size premium varies widely depending on the subdecile, ranging from 3.52% to 12.12%.[166]   The 10w subdecile contains market capitalizations from $250.7 million to $338.8 million and carries a 3.52% size premium.[167]   DFC's market capitalization was $346 million on April 1.  In my view, it is reasonable to assume that the market's reaction to the earnings reduction alone, excluding its reaction to the Transaction, would have pushed DFC into the 10w subdecile.[168]   In light of the market's probable reaction to DFC's earnings guidance, the 10w subdecile is the most reasonable category in my view, and I adopt its size premium of 3.52%.

---

[165] Beaulne Rebuttal at 10-11.

[166] *Valuation Handbook* Appendix 3.

[167] *Id.*

[168] A loss in market capitalization anywhere from about $7 million to $95 million would have had this result.

As noted above, Beaulne also employed a second size premium metric of 4.60% based on the Duff & Phelps Risk Premium Report. This methodology constructs a size premium based on a number of relevant company metrics including average net income, assets, sales, number of employees, and others.[169] Beaulne opines that it is helpful to use this measurement in addition to the Valuation Handbook because it captures other meaningful aspects of company size besides market capitalization,[170] which is not always perfectly correlated with company size.[171]

Dages opines that Beaulne erred by using the Risk Premium Report because the size premium in that report does not apply to financial services firms.[172] Indeed, Duff & Phelps admonishes practitioners not to use the Risk Premium Report for valuing financial services companies, because some of the inputs into the Risk Premium Report are difficult to apply to that sector, potentially leading to skewed results.[173] Specifically, the methodology should not be applied to companies with a Standard Industrial Classification ("SIC") code beginning with a

---

[169] Beaulne Report at 59.

[170] *Id.*

[171] Beaulne Rebuttal at 9.

[172] Dages Rebuttal ¶ 24.

[173] *Valuation Handbook* 7-4.

"6," which includes finance, insurance, and real estate firms.[174] DFC's SIC Code begins with a "6."[175]

Beaulne argues that it was appropriate to use the Risk Premium Report despite these warnings because DFC is different from most other financial services companies with SIC Codes beginning with a 6. For instance, DFC has lower leverage than other financial services companies, and most of DFC's peers do not have SIC Codes beginning with 6.[176] DFC may differ from the "typical" financial services firm, if there is such a thing, so perhaps using the Risk Premium Report would not cause a dire outcome. Nonetheless, the modest benefit of adding a second size premium metric is not warranted in my view given the methodology's clear parameters and warnings. Consequently, I decline to use a second size premium metric, and will use the premium of 3.52% derived from the 10w subdecile of the Valuation Handbook.

### 4. Tax Rate

Beaulne and Dages used different tax rates in their WACC calculations.[177] Dages used a tax rate of 32%, the rate that DFC management provided Houlihan to

---

[174] *Id.*

[175] Tr. 622 (Beaulne).

[176] Tr. 622-26 (Beaulne).

[177] For clarity, this section addresses the tax rate used in the calculation of DFC's WACC and in the calculation of its relevered beta. The tax rates used in the cash flow

calculate the WACC in its fairness opinion.[178]  Rather than use management's assumptions, Beaulne calculated a rate based on the weighted average of tax rates in the jurisdictions in which DFC was borrowing as of the closing date,[179] excluding certain convertible notes that contained an equity component.[180]  The experts disagree over how DFC deducts taxes from jurisdiction to jurisdiction.[181]

Respondent points out that DFC may only deduct interest in the jurisdictions in which the debt is issued, but does not address petitioners' other point, which seems to be that weighting the tax rate on the principal of the debt alone, without regard for the amount of interest paid on that debt, may result in an inaccurate weighted tax rate.[182]  This is because the weighted average outstanding debt in each jurisdiction may not correspond to the weighted average amount of interest paid, since a small outstanding debt with a high interest rate could generate a relatively higher tax shield than a larger outstanding debt with a low interest rate.

---

projections, which the parties do not dispute, are management estimates that vary with each year of the forecast period.  *See* Appendix A; JX 455 at 24.

[178] Dages Report ¶ 73.  *See also* Tr. 217 (Dages) (discussing 32% tax rate as agreed tax rate given to Houlihan for calculating cost of capital).

[179] Beaulne Report at 54.

[180] Tr. 589-91 (Beaulne).

[181] Tr. 267-68 (Dages).

[182] Pet'rs' Post-Trial Br. at 45.

These disputes over the minute details of calculating a custom estimated tax rate underscore the merits of Dages' approach, which relies on management's seemingly reasonable estimated tax rate, just as the experts' discounted cash flow models rely on management's other estimated financial projections. Considering the disagreement surrounding the appropriate actual tax rate based on DFC's debts as of April 1, 2014, not to mention the uncertainty regarding the tax rates in the jurisdictions of the company's future obligations, management's estimate of a 32% effective tax rate is the most reliable figure to use for this input.

\* \* \* \* \*

Using the inputs described above, I calculate DFC's weighted average cost of capital to be 10.72%,[183] a result coincidentally located roughly in the middle of Dages' and Beaulne's respective calculations of 9.5% and 12.4%, each of which the other expert argues is an extreme figure. I now turn to the other disputed figures in the experts' discounted cash flow models.

### 5. Net Working Capital and Excess Cash

Another factor about which the experts disagree is the appropriate level of net working capital. Dages used the balance sheet projection that management provided and that Houlihan used in its fairness opinion, as he did with the other

---

[183] The details of the WACC calculation are contained in Appendix B. *See also* Dages Report ¶¶ 70, 74 (listing formulas for WACC).

financial projections.[184]  In contrast, Beaulne estimated the net working capital at the end of each year as a percentage of total revenue, which came to 52 percent, and projected the company's net working capital based on that figure.[185]

As a general matter, petitioners and respondent both used the March Projections as the foundation for their discounted cash flow analyses, and do not appear to dispute that the March Projections are the appropriate figures to use.[186] Consequently, the decision to independently calculate one balance sheet item, net working capital, rather than to use management's projections, seems unusual. Beaulne explains that his measurement method is the most common one based on authoritative finance literature.[187]  Beaulne's decision to recalibrate net working capital based on historical trends is not warranted here, however, considering that the March Projections have been the focal point of the discounted cash flow analyses.  Put differently, there is no compelling reason to reject the March Projections regarding this figure while adhering to them regarding others.

Using his adjusted working capital projections, Beaulne surmised that DFC had a working capital deficit when the Transaction closed and therefore had no

---

[184] Dages Rebuttal ¶ 44.

[185] *Id.* ¶¶ 43-44; Beaulne Report at 49-52; Tr. 584-85, 682 (Beaulne).

[186] Beaulne Report at 40; Dages Report ¶ 59.

[187] Beaulne Report at 50; Resp't's Pretrial Br. at 56-57.

excess cash on its balance sheet.[188]  Because I reject Beaulne's recalibration of working capital, I also reject his assessment that DFC had no excess cash on that basis.

Dages used a different approach to calculate excess cash.  He began with DFC's balance sheet cash as of its March 31, 2014 10-Q, which amounted to $236.9 million.[189]  He then subtracted $150 million of operating cash requirements as estimated by Houlihan, with a resulting excess cash level of $86.9 million.[190] Respondent criticizes Dages for using the actual March 31, 2014 cash balance to estimate excess cash upon closing of the Transaction in June.  Respondent argues that using either the June 2014 cash balance as forecasted in the March Projections or DFC's actual June 2014 cash balance would have been timelier and more appropriate.[191]  Dages responds that he used the March 31 actual cash balance to be consistent with Houlihan but admitted that the June figures also could have been used.[192]

---

[188] Beaulne Report at 63-64.

[189] JX 498 at 3.

[190] Dages Report ¶ 92.

[191] Resp't's Pretrial Br. at 57.

[192] JX 602 at 229-30.

In my view, the June 2014 cash balance estimated in the March Projections should have been used instead of the actual March figure, because it estimates DFC's cash at a point closer to the closing of the Transaction and because it is more consistent with the model's reliance on the March Projections.[193] Using the projected June 2014 cash balance rather than the actual March balance reduces the level of excess cash from $86.9 million to $51.5 million. Although respondent contends that Houlihan's estimate of required operating cash was likely understated and points to deposition testimony suggesting as much, respondent provides no evidence quantifying a better number. I therefore adopt Houlihan's operating cash requirements and the excess cash level of $51.5 million.

### 6. Two-Stage or Three-Stage Model

The experts took different approaches to valuing the future cash flows of the company beyond management's projection period. Beaulne used a two-stage model, with the first stage based on management's projections for the period of 2014-2017, and the second stage being a terminal value calculated using the convergence formula beginning in 2018. Dages used a three-stage model. Stage one was based on management's projections for 2014-2018. Stage two used Dages' own projections for 2019 through 2023, which he calculated by applying a

---

[193] Resp't's Post-Trial Br. 55; JX 444 at 2 (noting operating cash projection of $201.5 million). *See also* Tr. 367 (Dages) (admitting that, absent changes to business, using more recent figure is preferable).

47

linear decline to step the growth rate down (1.8% per year) from management's projection of 11.7% in 2018 to the perpetuity growth rate of 2.7% in 2023.[194] His third stage is a terminal value calculated using the Gordon growth model and a 2.7% perpetuity growth rate. Dages also proposed in the alternative a two-stage model with a 3.1% perpetuity growth rate.[195]

Beaulne criticizes Dages' three-stage model for adding five years of new data beyond management's projections using linear extrapolation. He opines that this ten-year period is an unusually long forecast window, that management's projections were already prone to uncertainty, and that Dages' five-year extrapolation of these projections is speculative.[196] Dages contends that his three-stage model is the best valuation method, but does not otherwise dispute Beaulne's use of a two-stage model and the convergence formula, which Dages opines implies a perpetuity growth rate of 4.5%.[197]

Given the uncertainty regarding management's projections, I question the reliability of Dages' linear extrapolation of five years of additional projections. I agree with Beaulne's opinion that it is more appropriate to rely on management's

[194] Dages Report ¶¶ 91-92.

[195] Dages Report Ex. 16.

[196] Beaulne Rebuttal at 16-18.

[197] Dages Rebuttal ¶¶ 46-47, 53-54; Pet'rs' Post-Trial Br. 50.

48

projection period and then to estimate a terminal value as accurately as possible. The fact that the growth rate drops off somewhat sharply from the projection period to the terminal period is not ideal but not necessarily problematic, as this Court has recognized.[198]  Thus, in this case a two-stage model is preferable to a three-stage model that attempts to create a third stage by extrapolating new data from already imperfect projections.

I turn next to the question of how to select an appropriate perpetuity growth rate.  Dages used a perpetuity growth rate of 3.1% in his alternate two-stage version of his model, which appears in line with market theory and this Court's precedents.  This Court often selects a perpetuity growth rate based on a reasonable premium to inflation.[199]  Dages compiled inflation expectations around the time of the closing of the Transaction from a number of sources, including government forecasts, and noted a median inflation rate of 2.31%.[200]  Dages also notes that some financial economists view the risk-free rate as the ceiling for a stable, long-term growth rate.[201]  In this case, that suggested ceiling is the 3.14% risk-free rate

---

[198] *See Owen v. Cannon*, 2015 WL 3819204, at *26 (Del. Ch. June 17, 2015); *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *21 (Del. Ch. Mar. 9, 2011).

[199] *See Owen v. Cannon*, 2015 WL 3819204, at *26 ("There also is considerable precedent in Delaware for adopting a terminal growth rate that is a premium, such as 100 basis points, over inflation.").

[200] Dages Report ¶ 65.

[201] *Id.*

both experts agreed on.[202]   Thus, the 3.1% rate that Dages used in his alternative two-stage model[203]  represents a reasonable premium of 79 basis points over inflation, and falls just under the suggested ceiling represented by the 3.14% risk-free rate.

In contrast, Beaulne calculated his stage-two terminal value using the convergence model.  The convergence formula is based on the theory that, in the long-term, the return on investment in highly competitive industries will converge to the cost of capital as competition eliminates the opportunity to earn excess returns.[204]   As noted above, Dages opined that Beaulne's convergence formula implies a 4.5% perpetuity growth rate, which Dages admits is at the high end of the reasonable range of long-term growth rates.[205]   In my view, 4.5% is an inappropriately high perpetuity growth rate in this case.  Although one suggested ceiling for a company's perpetuity growth rate is nominal GDP, which Dages estimated as ranging from 4.5% to 4.8%,[206] economists have cautioned (as noted above) that the long-term growth rate should not be greater than the risk-free rate.

---

[202] *See supra* Part II.C.

[203] Dages Report ¶ 96, Ex. 16.

[204] *See* Hitchner, *supra* note 121, at 152-53; Tr. 627-28 (Beaulne).

[205] Dages Rebuttal ¶¶ 46-47.

[206] Dages Report ¶ 64-65.

The 4.5% perpetuity growth rate implied by Beaulne's convergence model is 136 basis points above that ceiling and represents an unusually large premium of 219 basis points above inflation.[207] Considering the significant regulatory risks that may affect the long-term viability of DFC's business model, such a premium over inflation is not appropriate in my view.[208]

Because the perpetuity growth rate is not an input in the convergence formula, I cannot simply pick a more reasonable rate to use in that model. In contrast, the Gordon growth model's inputs are the terminal year's cash flow, the perpetuity growth rate, and the cost of capital.[209] The Gordon growth model is

---

[207] *See, e.g.*, *Owen v. Cannon*, 2015 WL 3819204, at *25-26 (adopting premium of 100 basis points above inflation); *Towerview LLC v. Cox Radio, Inc.*, 2013 WL 3316186, at *26-27 (Del. Ch. June 28, 2013) (using growth rate 25 basis points above the low end of inflation forecast); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 334, 337 (Del. Ch. 2006) (applying growth rate 100 basis points above inflation); *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *13 (Del. Ch. Nov. 24, 2004) (applying perpetuity growth rate 100-200 basis points above inflation), *aff'd*, 875 A.2d 632 (Del. 2005) (TABLE); *Cede & Co. v. JRC Acquisition Corp.*, 2004 WL 286963, at *6 (Del. Ch. Feb. 10, 2004) (applying growth rate 100 basis points above inflation). *See also In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 226 (Del. Ch. 2014) (choosing perpetuity growth rate falling "comfortably between" inflation rate and nominal GDP growth rate, at 160 basis point premium to inflation), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 868 (Del. 2015).

[208] *See JRC Acquisition Corp.*, 2004 WL 286963, at *6 (adopting growth rate only 100 basis points above inflation due to evidence of declining tobacco market).

[209] *See Cost of Capital* at 41.

commonly used in this Court.[210]  Because it is widely accepted and allows me to select an appropriate perpetuity growth rate, I use a two-stage Gordon growth model and a perpetuity growth rate of 3.1% to calculate DFC's value.

### 7. Stock-Based Compensation

The experts agree that some adjustment to DFC's free cash flows must be made to account for stock-based compensation in the form of options and restricted stock units, but they disagree over how to make such an adjustment.  Dages presents four different scenarios, each of which he acknowledges is an "imperfect measure" of the impact the future exercise of stock-based compensation will have on DFC's free cash flows.[211]  The scenario he considers most reliable, which he uses in his discounted cash flow, replaces management's projected stock-based compensation expenses with the average historical net cash outflow for such compensation, as a percentage of revenues, further adjusted to reflect tax benefits.[212]  Beaulne uses the stock-based compensation expenses projected in the

---

[210] *See, e.g.*, *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at \*23 (Del. Ch. July 8, 2013); *Golden Telecom*, 993 A.2d at 511; *Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 2801387, at \*14 (Del. Ch. May 2, 2007).

[211] Dages Report ¶¶ 89-90.

[212] *Id.* ¶ 89.

management model, deducting that amount from free cash flows, which he asserts is a common practice.[213]

In previous cases, this Court has opined that some adjustment must be made for stock-based compensation but lamented the unavailability of an accurate method for making such an adjustment. In both *BMC* and *Ancestry.com*, this Court noted that deducting the full amount of accounting expense for stock-based compensation from cash flows likely overstated the impact on cash earnings, but nonetheless adopted that method because the opposing expert in each case had not provided a better method for estimating cash impact.[214]

In contrast to those cases, Dages offers a reasonable means of estimating the impact of future stock-based compensation on cash flows by extrapolating historical cash expense into future years. Although Beaulne opines that stock-based compensation expense is already calculated using fair value measures,[215] he overlooks the distinction between a fair value accounting expense and an impact

---

[213] Beaulne Report at 48.

[214] *See Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at \*10, \*13 (Del. Ch. Oct. 21, 2015) (adopting use of full accounting expense as cash impact because other expert's method did not incorporate effect of expected future stock-based compensation), *judgment entered*, 2015 WL 6737350 (Del. Ch. Nov. 3, 2015); *In re Appraisal of Ancestry.com*, 2015 WL 399726, at \*22 (adopting method deducting non-cash stock expense from EBIT because, while method was imperfect, opposing expert offered no reliable alternative).

[215] Beaulne Rebuttal at 26.

on cash flows. Consequently, subtracting the accounting expense for all stock-based compensation from projected cash earnings, a crucial input in a discounted cash flow model, was inappropriate. Although it may not be possible to perfectly estimate the future cash impact of stock-based compensation, in this case Dages' estimate based on historical cash expense is the most reasonable approach. Respondent criticizes the fact that Dages' method is novel and that it risks *understating* cash expense if, for example, the company's stock price were to rise significantly after options were granted.[216] But the risk of inaccuracy is inherent in any attempt to project future expenses. In my view, the hypothetical risk that Dages' method could lead to an understated cash expense is less problematic than the much likelier possibility that treating the full accounting expense as a cash outlay would overstate cash expense. I therefore adopt Dages' method.[217]

* * * * *

Using the inputs and methodologies described above, I have constructed a discounted cash flow model that estimates the fair value of DFC's shares as of the

---

[216] Resp't's Post-Trial Br. 56-57.

[217] I also adopt Dages' calculation of total shares outstanding, which adds shares for exercisable options and restricted stock units, adjusted for the Court's lower valuation compared to his. Based on his tables and the Court's valuation, approximately 39.5 million shares would be outstanding.

date of the Transaction to be $13.07 per share.[218] The model is summarized in Appendix A.

### D. Multiples-Based Comparable Company Analysis

Dages did not rely on a multiples-based valuation, instead placing all weight on his discounted cash flow valuation.[219] He opined that multiples-based valuations do not necessarily reflect the intrinsic value of an enterprise, do not allow the inclusion of company-specific operating characteristics, and do not fully account for long-term growth potential.[220] With admirable thoroughness, Dages performed a multiples-based valuation despite giving it no weight in his analysis. He used the same peer group of nine companies that he used to estimate DFC's beta for his WACC.[221]

Beaulne performed a multiples-based valuation using the same peer group of six companies that he used to calculate beta. For the same reasons discussed above that I found Beaulne's peer group acceptable for calculating beta and the additional three companies Dages identified to be inapt comparisons, I find that the peer

---

[218] *See* Appendix A.

[219] Dages Report ¶ 100.

[220] *Id.* ¶¶ 100-102.

[221] *Id.* ¶ 103. Using the 75th percentile of the peer group, Dages estimated a valuation between $11.38 and $15.65 per share based on the 2014 and 2015 estimated EBITDA from the March projections, and $26.95 per share based on the last twelve months' EBITDA. *Id.* ¶¶ 103-04.

group Beaune has identified provides an appropriate set of comparable companies.[222]

To perform his valuation, Beaulne used the median of three multiples: market value of invested capital over 2014 estimated EBITDA, market value of invested capital over estimated 2015 EBITDA, and market value of invested capital over last twelve months' EBITDA.[223] Averaging the valuations implied by these three metrics, Beaulne calculated a value of $8.07 per share.[224]

Dages contends that Beaulne erroneously chose to use the median peer group value of each multiple rather than the 75th percentile, which Dages viewed as more appropriate considering DFC's long-term projected growth and profitability.[225] But DFC ranked below the 50th percentile of the peer group in several (though not all) key financial metrics.[226] Dages admitted, furthermore, that

---

[222] *See supra* Part II.C.1.b.

[223] Beaulne Report at 67.

[224] *Id.* at 69. Beaulne also performed a multiples-based valuation using guideline merged and acquired companies, with a resulting valuation of $7.69 per share, but did not give this method any weight. *Id.* at 69-70.

[225] Dages Rebuttal ¶ 51.

[226] Dages Report Ex. 5.

using the median or 50th percentile is a more common benchmark, and that this was the only valuation he could recall in which he used the 75th percentile.[227]

In my view, Beaulne used a reasonable methodology in his multiples-based analysis by selecting a suitable peer group, using correct multiples, and basing his analysis on the median rather than another percentile. For these reasons, I will adopt Beaulne's comparable company methodology and its valuation of $8.07 per share.[228] This leaves the question of how much weight to give it in relation to the other valuation methodologies. I address that question below.

## E. Deal Price

The third and final valuation input I will consider is the price of the Transaction: $9.50 per share. The parties heatedly dispute whether the transaction price is an appropriate indicator of fair value in this case. The merger price in an arm's-length transaction that was subjected to a robust market check is a strong

---

[227] Tr. 379-80 (Dages).

[228] Dages also criticized certain financial adjustments Beaulne made in the comparable company analysis, namely the subtraction of stock-based compensation expenses. Dages Rebuttal ¶ 50. Unlike in the case of his discounted cash flow analysis, Dages did not opine on whether or why stock-based compensation should or should not be adjusted in the comparable company analysis, nor did he provide a superior methodology that would adjust for stock-based compensation expense more appropriately. *See supra* Part II.C.7. He also noted that he was not certain whether or not his own data source adjusted for stock-based compensation in the peer companies. Dages Report ¶ 103 n.213. I therefore adopt Beaulne's approach.

indication of fair value in an appraisal proceeding as a general matter,[229] and this

Court has attributed 100% weight to the market price in certain circumstances.[230]

The advantage of an arm's-length transaction price as a reliable indicator of

fair value is that it is "forged in the crucible of objective market reality (as

distinguished from the unavoidably subjective thought process of a valuation

expert) . . . ."[231] This insight is particularly apt here, where the subjective thought

processes of two well-credentialed valuation veterans have led to chasmic

differences in their estimated fair values, despite their using similar methodologies

and the same baseline set of financial projections. By the same token, the market

---

[229] *See Golden Telecom*, 993 A.2d at 507 ("It is, of course, true that an arms-length merger price resulting from an effective market check is entitled to great weight in an appraisal."); *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007) (when transaction is product of arm's-length process without structural impediments, the "reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value"); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 358-59 (Del. Ch. 2004) (Strine, V.C.) (finding merger price resulting from a competitive and fair auction to be a superior valuation technique to discounted cash flow).

[230] *See, e.g.*, *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *20, 25 (Del. Ch. June 30, 2015) (citing authorities and giving 100% weight to transaction price, minus synergies); *CKx*, 2013 WL 5878807, at *13 (giving 100% weight to deal price and instructing parties to confer regarding adjustments for synergies); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at *4, *8 (Del. Ch. May 19, 2014) (declining in subsequent opinion to make any adjustments to deal price, including for synergies), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (TABLE); *Union Ill.*, 847 A.2d at 364 (awarding merger price, net of synergies). In this case, I am unconcerned with adjusting for synergies because Lone Star was a financial buyer rather than a strategic acquirer.

[231] *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991).

58

price is informative of fair value only when it is the product of not only a fair sale process, but also of a well-functioning market.

In my view, the deal price is an appropriate factor to consider in this case. DFC was purchased by a third-party buyer in an arm's-length sale. The sale process leading to the Transaction lasted approximately two years and involved DFC's advisor reaching out to dozens of financial sponsors as well as several potential strategic buyers.[232] The deal did not involve the potential conflicts of interest inherent in a management buyout or negotiations to retain existing management—indeed, Lone Star took the opposite approach, replacing most key executives.[233] These circumstances provide me a reasonable level of confidence that the deal price can fairly be used as one measure of DFC's value.

\* \* \* \* \*

Having established and analyzed the three most reliable measures of DFC's value, I now turn to weighing them in order to formulate a fair appraisal value.

### F.     Weighing the Inputs to Estimate Fair Value

This Court has relied from time to time on multiple valuation techniques to determine fair value, giving greater weight to the more reliable methodologies in a

---

[232] *See supra* Part I.C.

[233] Tr. 553-54 (Barner).

particular case.[234] As explained above, three inputs merit consideration in calculating DFC's fair value: the result of my discounted cash flow analysis, which incorporates certain aspects of each expert's discounted cash flow model and some of my own assumptions; Beaulne's multiples-based comparable company analysis; and the transaction price.

Each of these valuation methods suffers from different limitations that arise out of the same source: the tumultuous environment in the time period leading up to DFC's sale. As described above, at the time of its sale, DFC was navigating turbulent regulatory waters that imposed considerable uncertainty on the company's future profitability, and even its viability.[235] Some of its competitors faced similar challenges. The potential outcome could have been dire, leaving DFC unable to operate its fundamental businesses, or could have been very positive, leaving DFC's competitors crippled and allowing DFC to gain market dominance. Importantly, DFC was unable to chart its own course; its fate rested

---

[234] *See, e.g., Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *20 (Del. Ch. Aug. 19, 2005) (attributing 75% weight to discounted cash flow because management projections were reliable, and 25% weight to comparable company analysis because of good peer group and benefit of additional insight provided by the approach); *Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *2-3 (Del. Ch. Sept. 24, 2010) (adopting valuation of expert who applied multiple valuation techniques, noting that Court has more confidence in the accuracy of multiple valuation methods when the results support each other, and criticizing other expert's use of only one technique rather than a blend of valuation methods).

[235] *See supra* Part I.B.

largely in the hands of the multiple regulatory bodies that governed it. Even by the time the transaction closed in June 2014, DFC's regulatory circumstances were still fluid.[236]

This uncertainty impacted DFC's financial projections. As discussed above, DFC repeatedly adjusted its projections downward, cutting its fiscal year 2014 adjusted EBITDA forecast from $200-240 million to $151-156 million in the span of a few months, while noting that regulatory uncertainty made it impractical to project earnings per share.[237] This series of adjustments calls into question the reliability of DFC's financial projections at the time, and necessarily reduces one's confidence in the March Projections upon which the experts' discounted cash flow models and my own are based.[238] Consequently, although a discounted cash flow analysis may deserve significant emphasis or sole reliance in cases where the Court has more confidence in the reliability of the underlying projections than in the

---

[236] Tr. 439 (Kaminski).

[237] *See supra* Parts I.B-C.

[238] *See* Tr. 502-03 (Barner) (discussing Lone Star's concern over management's ability to forecast accurately). Although Lone Star prepared its own set of projections with higher revenue and EBITDA than the March Projections, PTO ¶¶ 184-85, those projections reflect Lone Star's planned initiatives for the company after the acquisition, and thus do not represent its fair value for appraisal purposes. Tr. 496-97 (Barner). In addition, the fact that the financials show a potential recovery does not mitigate the problem with the March Projections, namely that they were unreliable and subject to change. A forecasted significant recovery could still be unreliable, undermining confidence in the discounted cash flow model.

transaction price,[239] I do not believe it merits a disproportionate weighting in this case.

This same uncertainty inherent in the projections underlying the discounted cash flow analysis was present in the sale process. Although the sale process extended over a significant period of time and appeared to be robust, DFC's performance also appeared to be in a trough, with future performance depending on the outcome of regulatory decision-making that was largely out of the company's control. Lone Star was aware of DFC's trough performance and uncertain outlook—these attributes were at the core of Lone Star's investment thesis to obtain assets with potential upside at a favorable price.[240] To the extent Lone Star understood DFC's unique position and potential value but the market of other potential bidders did not, then the transaction price would not necessarily be a reliable indicator of DFC's intrinsic value.[241] Lone Star's status as a financial

---

[239] *See In re Appraisal of Dell*, 2016 WL 3186538, at *51 (attributing 100% weight to discounted cash flow model due to unreliability of market pricing stemming from imperfect sale process).

[240] *See* Tr. 533-37 (Barner); JX 428 at 16 (noting that Lone Star saw DFC as an opportunity to acquire an excellent global platform at a trough and to purchase it during a period of regulatory uncertainty before a recovery to historical EBITDA margins).

[241] This commentary should not be construed as an opinion on the propriety of Lone Star's investment strategy or bidding process, as Lone Star's conduct is not on trial in this appraisal action. Rather, the circumstances through which Lone Star purchased DFC are relevant to assessing whether the transaction was the product of a robust competitive bidding process with potential buyers who understood DFC's intrinsic value.

sponsor, moreover, focused its attention on achieving a certain internal rate of return and on reaching a deal within its financing constraints, rather than on DFC's fair value.[242] For instance, one of the reasons Lone Star reduced its offer to $9.50 was that its available financing for the transaction had fallen by another $100 million (to a total reduction of $300 million) due to DFC's additional reductions in projected EBITDA.[243]

The 45-day exclusivity period Lone Star negotiated in March 2014 and the short (six-day) window Lone Star afforded for considering its reduced offer of $9.50 may have negatively affected the sale process.[244] These events do not undermine my level of confidence in the robustness of the market for DFC, however, because they occurred at the end of what had been an extended (almost two-year) sale process and because any of the potential buyers who had expressed interest in buying DFC at a higher price could have renewed their interest after the transaction was announced in April, particularly given that the termination fee was reasonable and bifurcated to allow for a reduced fee in the event of a superior proposal.[245] Despite the fact that $9.50 was significantly lower than J.C. Flowers'

---

[242] Dages Report ¶¶ 114-16.

[243] PTO ¶ 148; Tr. 552 (Barner).

[244] PTO ¶¶ 147, 151-54. Lone Star originally offered only 24 hours to accept, but later extended the acceptance period so that it ran from March 27 to April 1. *Id.* ¶ 149.

[245] JX 463 Ex 2.1 §§ 7.1(d)(iii), 7.3(b); Tr. 63 (Gavin).

previous indication of interest at $13.50, neither J.C. Flowers nor any other potential buyer expressed any interest in competing with Lone Star's offer of $9.50.

The uncertainty surrounding DFC's financial projections also affects the reliability of the multiples-based valuation, because this valuation relies on two years of management's projected EBITDA.[246] Nonetheless, the multiples-based valuation may be less prone to long-term uncertainty compared to the discounted cash flow model, because it relies only on projections through 2015 rather than 2018, and because one third of the valuation relies on historical EBITDA data. In addition, because it relies on the multiples of several peer companies, it is less susceptible to the firm-specific issues that could hinder a competitive bidding environment and reduce the reliability of market price as an indicator of fair value. Consequently, although the multiples-based approach may be less frequently relied upon than market price or a discounted cash flow valuation, I find it to be a valuable source of information in this case.

In sum, all three metrics suffer from various limitations but, in my view, each of them still provides meaningful insight into DFC's value, and all three of them fall within a reasonable range. In light of the uncertainties and other considerations described above, I conclude that the proper valuation of DFC is to

---

[246] *See supra* Part II.D.

weight each of these three metrics equally. Weighing at one-third each the discounted cash flow valuation of $13.07 per share, the multiples-based valuation of $8.07 per share, and the transaction price of $9.50 per share, I conclude that the fair value of DFC at the time of the Transaction was $10.21 per share.

## III. CONCLUSION

Petitioners are entitled to the fair value on the closing date of $10.21 per share and to interest accruing from June 13, 2014, at the rate of 5% over the Federal Reserve discount rate from time to time, compounded quarterly.[247] The parties are instructed to confer and submit a final judgment within five business days in accordance with this opinion.

---

[247] 8 *Del. C.* § 262(h).

# Appendix A

**Discounted Cash Flow Analysis**
(in millions)

| | Fiscal Year Ending June 30 | | | | | |
| | 2014P | 2015P | 2016P | 2017P | 2018P | Terminal |
|---|---|---|---|---|---|---|
| EBITDA[1] | $143.3 | $165.4 | $214.9 | $269.5 | $329.4 | |
| Less: Depreciation and Amortization | (44.8) | (45.1) | (46.4) | (46.6) | (46.6) | |
| Plus: Adjustment for SBC Accounting/Cash Difference[2] | | 5.6 | 6.4 | 6.8 | 7.0 | |
| EBIT | $98.5 | $125.9 | $174.9 | $229.7 | $289.8 | |
| Tax Rate | | 42.3% | 35.9% | 32.1% | 30.7% | |
| Less: Income Tax | | (53.3) | (62.8) | (73.7) | (89.0) | |
| **Unlevered Net Income** | | **$72.7** | **$112.1** | **$156.0** | **$200.8** | |
| | | | | | | |
| Plus: Depreciation & Amortization | | 45.1 | 46.4 | 46.6 | 46.6 | |
| Less: Capital Expenditures | | (35.8) | (42.6) | (44.1) | (45.7) | |
| Less: Changes in Working Capital[3] | | (48.8) | (54.5) | (69.8) | (71.6) | |
| **Unlevered Free Cash Flow[4]** | **$2.1** | **$33.2** | **$61.4** | **$88.7** | **$130.1** | **$ 1,761** |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| WACC | 10.72% | 10.72% | 10.72% | 10.72% | 10.72% | 10.72% |
| Discount Period (mid-year convention) | 0.02 | 0.55 | 1.55 | 2.55 | 3.55 | 3.55 |
| Present Value Factor | 1.00 | 0.95 | 0.85 | 0.77 | 0.70 | 0.70 |
| Present Value of Distributable Cash Flows | **$2.1** | **$31.4** | **$52.4** | **$68.4** | **$90.7** | **$1,226.6** |

**Enterprise Value**

| | | | | |
|---|---|---|---|---|
| PV of Distributable Cash Flows (2014-2018) | $244.9 | | Discount Rate | 10.72% |
| PV of Residual Cash Flows | $1,226.6 | | Perpetuity Growth Rate | 3.10% |
| Cash and Equivalents | $51.5 | | Valuation Date | 13-Jun-14 |
| **Enterprise Value** | **$1,523.0** | | | |
| Add: PV of Net Operating Loss Balance[5] | $38.1 | | | |
| Less: Debt | $1,044.4 | | | |
| **Equity Value** | **$516.74** | | | |
| Shares Outstanding[6] | 39.53 | | | |
| Value Per Share | $13.07 | | | |

[1] Based on Beaulne's adjusted EBITDA, which includes full accounting SBC expense. Financial projections use Beaulne's model.

[2] Adds back difference between full accounting SBC expense and Dages' estimated SBC cash expense.

[3] Uses Beaulne's model but removes his adjustments to working capital based on 52.0% fixed rate assumption.

[4] 2014 unlevered cash flow based on Dages' calculation of prorated cash flow from June 13 until June 30.

[5] Based on Beaulne's NOL model, adjusted for 10.72% discount rate.

[6] Approximates adjusted shares outstanding using Dages' model and a $13 exercise price.

# Appendix B

# WACC Calculation

| Peer Group Company | 5Y Smoothed Bloomberg Beta | Total Debt ($000's) | Market Val of Equity ($000's) | Equity/Capital Ratio | Debt/Capital Ratio | Effective Tax Rate | Hamada Unlevered Beta |
|---|---|---|---|---|---|---|---|
| Cash America International, Inc. | 0.9765 | 630,256 | 1,224,887 | 66.03% | 33.97% | 35.00% | 0.7317 |
| Cash Converters International Limited | 0.8909 | 104,513 | 431,082 | 80.49% | 19.51% | 30.00% | 0.7616 |
| EZCORP, Inc. | 1.1050 | 229,121 | 668,900 | 74.49% | 25.51% | 35.00% | 0.9038 |
| First Cash Financial Services Inc. | 0.8951 | 200,000 | 1,551,881 | 88.58% | 11.42% | 35.00% | 0.8259 |
| International Personal Finance Plc | 1.8789 | 664,292 | 2,435,081 | 78.57% | 21.43% | 21.00% | 1.5458 |
| World Acceptance Corp. | 0.9972 | 505,500 | 761,218 | 60.09% | 39.91% | 38.25% | 0.7072 |
| DFC Global Corp. | 1.1833 | | | 26.00% | 74.00% | 32.00% | 0.4031 |

| | |
|---|---|
| **Peer Group & DFC Average Unlevered Beta:** | 0.8399 |
| **DFC Relevered Beta:** | 2.4653 |
| Hamada Unlevered Beta = (Levered Beta) / (1 + (1-T)(Wd/We)) | |
| Hamada Relevered Beta = Unlevered Beta * (1+(1-T)(Wd/We)) | |

| Input | Value | Notes |
|---|---|---|
| Risk-free Rate (Rf) | 3.14% | 20-year Total Constant Maturity Treasury Yield |
| Beta (β) | 2.4653 | Avg. of 6 peers and DFC, relevered for DFC |
| Equity Risk Premium (ERP) | 6.18% | Duff & Phelps Supply-Side Equity Risk Premium |
| Size Premium (SP) | 3.52% | Duff & Phelps Size Premium, Subdecile 10w |
| Tax Rate (T) | 32.00% | Management Assumption |
| Debt/Capital (Wd) | 74.00% | Capital structure at close |
| Equity/Capital (We) | 26.00% | Capital structure at close |
| Cost of Equity (Ke) | 21.90% | Ke = Rf + (β * ERP) + SP |
| Cost of Debt (Kd) | 10.00% | 2016 Senior Note YTM |
| **WACC** | 10.72% | WACC = (We * Ke) + (Wd * (Kd * (1 – T))) |